|   |   |
|---|---|
| **KATHERINE CHABOLLA,**<br><br>Plaintiff,<br><br>v.<br><br>**CLASSPASS INC.**, *et al.*,<br><br>Defendants. | Case No. 4:23-cv-00429-YGR<br>**ORDER DENYING MOTION TO COMPEL ARBITRATION**<br>Re: Dkt. No. 28 |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Plaintiff Katherine Chabolla, individually and on behalf of a putative class, brings this action against defendants ClassPass Inc., ClassPass LLC, and ClassPass USA LLC (collectively, "ClassPass") alleging violations under California's Automatic Renewal Law, Unfair Competition Law, and Consumers Legal Remedies Act. These claims relate to plaintiff's contention that ClassPass charged her, without her consent, for an automatically renewing monthly ClassPass membership.

Pending before the Court is defendants' motion to compel individual arbitration of Ms. Chabolla's claims pursuant to ClassPass' Terms of Use (the "Terms"), to which defendants assert she agreed while registering for a ClassPass membership. Having carefully considered the pleadings in this action as well as parties' briefs and for the reasons below, the Court finds the Terms is not a duly enacted agreement between the parties. Defendants' motion to compel arbitration is therefore **DENIED**.[1]

---

[1] ClassPass asks this Court to judicially notice two exhibits consisting, respectively, of the American Arbitration Association's ("AAA") Commercial Arbitration Rules as well as the JAMS Comprehensive Arbitration Rules & Procedures. *See* Dkt. No. 28-7, Defendants' Request for Judicial Notice. As the Court finds the Terms do not constitute an enforceable agreement between the parties, it need not determine whether the Terms clearly and unmistakably delegate issues of arbitrability to the arbitrator, including by referencing the AAA and JAMS rules. Defendants' request is therefore **DENIED AS MOOT**.

Further, pursuant to Federal Rule of Civil Procedure 78(b) and Civil Local Rule 7-1(b), the Court finds this motion appropriate for decision without oral argument.

1

**I.    BACKGROUND**

A. ClassPass Sign-Up Webflow

Plaintiff created an account and purchased a ClassPass trial monthly membership on January 30, 2020 through defendants' website. (Dkt. No. 28-1, Decl. of Nina Bayatti in Support of Defendants' Motion to Compel Arbitration ("Bayatti Decl.") ¶ 5.) Doing so required that Ms. Chabolla navigate a sign-up webflow consisting of at least three webpages. (*See id.* ¶¶ 6-11; *see also* Appendix (consisting of screenshot images of the relevant webpages).) *First*, before entering the sign-up webflow, prospective members visit a landing page advertising "Exclusive deal[s] for friends of ClassPass," such as the chance to "[b]ook up to [seven] classes" for $5, a $45 value. (Bayatti Decl. at Ex. 1; Appendix (Landing Page).) They are required to select one of three packages and click "Continue" to advance to the sign-up webflow. (*Id.*)

*Second*, prospective members visit the first page of the sign-up webflow, entitled "You're invited to join ClassPass," on which they are prompted, through a sign-up field, to "[e]nter [their] email to continue" or to sign up for ClassPass via an existing Facebook account. (Bayatti Decl. at Ex. 2; *see also* Appendix (Sign-Up Webflow: Screen #1).) Underneath the sign-up field, the webpage contains a text notice stating, "By clicking 'Sign Up with Facebook' or 'Continue,' I agree to the Terms of Use and Privacy Policy." (*Id.*) Both "Terms of Use" and "Privacy Policy" appear in blue and are hyperlinked to separate webpages on which the Terms and Privacy Policy, respectively, appear.[2] (Bayatti Decl. ¶ 9.) The rest of the text notice appears in a faint, gray-colored font. (Appendix (Sign-Up Webflow: Screen #1).)

*Third*, prospective members visit a webpage containing a sign-up field prompting them to enter their first and last name. (*Id.* at Ex. 3; Appendix (Sign-Up Webflow: Screen #2).) There is a short text notice below the sign-up field but above the "Continue" button, stating, "By signing up you agree to our Terms of Use and Privacy Policy." (*Id.*) Prospective members are required to click "Continue" to advance to the next step of the sign-up webflow. (Bayatti Decl. ¶ 10.)

*Fourth*, prospective members arrive at the final page of the sign-up webflow, on which the

---

[2] Subsequent references to the "Terms of Use" and "Privacy Policy" in the sign-up webflow are similarly hyperlinked.

details of their trial membership, its cost, and its renewal terms are purportedly displayed. (*Id.* at Ex. 4; Appendix (Sign-Up Webflow: Screen #3).) The right-hand side of this webpage includes a sign-up field in which prospective members like Ms. Chabolla are prompted to enter their payment information (*i.e.*, credit card number, billing address). (*Id.*) Below that sign-up field and above a "Redeem now" button appears a short text notice that reads, in relevant part, "I agree to the Terms of Use and Privacy Policy." (*Id.*)

B. Arbitration Provisions

The ClassPass arbitration provisions are not displayed on any of the pages in the sign-up webflow. Instead, prospective members can access the Terms (which contain the arbitration provisions) by clicking on the hyperlinked "Terms of Use" button on the above referenced sign-up webpages or locating the Terms elsewhere on the ClassPass website. (Dkt. No. 28-5, Decl. of Jessica Van Meter in Support of Defendants' Motion to Compel Arbitration ("Van Meter Decl.") ¶ 4.) Upon clicking the button, prospective members would have been presented a 24-page Terms document, the last approximately four pages of which contain the arbitration provisions. (*See generally id.* at Ex. 1.) Were a prospective member to load the Terms, they might notice that the second substantive paragraph of the document appears to preview the inclusion of the arbitration provisions later in the document by stating, "THESE TERMS CONTAIN A BINDING ARBITRATION AGREEMENT AND CLASS ACTION WAIVER . . . . YOU EXPRESSLY AGREE THAT DISPUTES BETWEEN YOU AND CLASSPASS WILL BE RESOLVED THROUGH BINDING, INDIVIDUAL ARBITRATION, AND YOU HEREBY WAIVE YOUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS WIDE ARBITRATION." (*Id.* at p. 1) (emphasis in original).

**II.    LEGAL FRAMEWORK**

The Federal Arbitration Act ("FAA") requires federal district courts to stay judicial proceedings and compel arbitration of claims covered by a written and enforceable arbitration agreement. 9 U.S.C. § 3. "The FAA reflects 'both a 'liberal federal policy favoring arbitration' and the 'fundamental principle that arbitration is a matter of contract.'" *Berman v. Freedom Financial Network, LLC*, Case. No. 18-cv-0160-YGR, 2020 WL 5210912 (N.D. Cal. Sept. 1, 2020) (*quoting*

3

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (additional citation omitted).

In ruling on the motion, the Court's role is typically limited to determining whether: (i) an agreement exists between the parties to arbitrate; (ii) the claims at issue fall within the scope of the agreement; and (iii) the agreement is valid and enforceable. *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). The party seeking to compel arbitration bears the burden to establish these conditions. "[I]f there is a genuine dispute of material fact as to any of these queries, a [d]istrict [c]ourt should apply a 'standard similar to the summary judgment standard of Fed. R. Civ. P. 56.'" *Ackerberg v. Citicorp USA, Inc.*, 898 F. Supp. 2d 1172, 1175 (N.D. Cal. 2012) (quoting *Concat LP v. Unilever, PLC,* 350 F.Supp.2d 796, 804 (N.D. Cal. 2004)). "If the parties contest the *existence* of an arbitration agreement, the presumption in favor of arbitrability does not apply." *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) (emphasis in original).

### III.  ANALYSIS

#### A.  Choice of Law

The Court begins by assessing which State's laws to apply. *Berman* provides a helpful roadmap. There, the Ninth Circuit considered an online contract dispute were, as here, "the parties agree that either New York or California law governs." *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). Because "New York and California apply 'substantially similar rules for determining whether the parties have mutually assented to a contract term,'" the Ninth Circuit held that it "need not decide which State's law governs 'because both California and New York law dictate the same outcome." *Id.* (quoting *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66, 74 (2d. Cir. 2017); *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014); *see also Oberstein v. Live Nation Entertainment*, 60 F.4th 505, 514 (9th Cir. 2023) (noting the *Berman* court applied a "materially indistinguishable two-part [inquiry notice] test that is used by both California and New York courts"). This Court follows the Ninth Circuit's approach in *Berman* and similarly determines it need not decide whether to apply California or New York law as the end result will be the same.

4

B.  <u>Validity of the ClassPass Arbitration Agreement</u>

As parties do not appear to contest the existence of the arbitration provisions, here, the Court's role is limited "to determining whether a valid arbitration agreement exists." *Id.* "To form a contract under New York or California law, the parties must manifest their mutual assent to the terms of the agreement," which may be achieved through "written or spoken word" or alternatively by their conduct. *Id.* (citations omitted); *see also* Restatement (Second) of Contracts § 19(2) (1981). These foundational concepts of contract formation "apply with equal force to contracts formed online." *Berman*, 30 F.4th at 855-56.

As the Ninth Circuit explained in *Berman*, "courts confronted with online agreements . . . have devised rules to determine whether meaningful assent has been given" to make the agreements enforceable. *Id.* at 856. There, the Ninth Circuit articulated a standard for evaluating the enforceability of such agreements "based on an inquiry notice theory." *Id.* "Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found . . . only if: (1) the website provides ***reasonably conspicuous notice*** of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that ***unambiguously manifests his or her assent*** to those terms." *Id.* (citing *Meyer*, 868 F.3d at 75; *Nguyen*, 763 F.3d at 1173) (emphasis supplied). Here, defendants do not contend plaintiff had actual knowledge of the provisions to arbitration. The Court therefore proceeds to conduct *Berman*'s two-part inquiry notice analysis.

      *i.*    "Sign-In Agreements"

As a threshold matter, the Court considers how best to classify the provisions at issue for the purposes of the proceeding analysis. While examples of online contract formation abound, "[m]ost courts now have identified at least four types of internet contract formation, most easily defined by the way in which the user purportedly gives their assent to be bound by the associated terms . . . ." *Sellers v. JustAnswer LLC*, 73 Cal.App.5th 444, 463 (2021), *reh'g denied* (Jan. 18, 2022), *review denied* (Apr. 13, 2022). Of these, "[s]ign-in-wrap agreements are those in which a user signs up to use an internet product or service, and the sign-up screen states that acceptance of a separate agreement is required before the user can access the service. While a link to the separate

5

1  agreement is provided, users are not required to indicate that they have read the agreement's terms
2  before signing up." *Id.* at 464 (citations omitted). Here, ClassPass' sign-up webflow constitutes a
3  sign-in agreement because (i) it contains textual notices of the Terms; (ii) the Terms are
4  hyperlinked but not incorporated into the webflow; and (iii) prospective members are not required
5  to affirmatively indicate that they have reviewed the Terms prior to registering for a membership.

        *ii.* *Validity of the Sign-In Agreement At Issue*

   The Court next weighs whether *Berman*'s inquiry notice standard is satisfied by the sign-in agreement at issue here. In *Sellers*, the California Court of Appeals identified a list of criteria federal courts tend to rely upon when assessing "whether a textual notice is sufficiently conspicuous under California law." *Id.* at 473. These include: "1) the size of the text; 2) the color of the text as compared to the background it appears against; 3) the location of the text and, specifically, its proximity to any box or button the user must click to continue use of the website; 4) the obviousness of any associated hyperlink; and 5) whether other elements on the screen clutter or otherwise obscure the textual notice." *Id.*

   **Reasonably Conspicuous Notice.** The inquiry notice analysis requires that the Court scrutinize the three ClassPass sign-up webpages that link to the Terms. To begin, the Court assesses the visual elements of the at-issue webpages. In each instance, the text notices appear in a faint, light gray font, except for the phrases "Terms of Use" and "Privacy Policy," which appear in blue. (*See generally* Appendix.) The notice here is therefore similar to the one at issue in *Berman*, which appeared "in a tiny gray font considerably smaller than the font used in the surrounding website elements" and where "[t]he comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else." [3] 30 F.4th at 856-57. Here, the surrounding

---

[3] As described, *supra*, the phrases "Terms of Use" and "Privacy Policy" appeared in blue font unlike the remainder of the textual notice here and the entirety of the textual notice in *Berman*. This could alert a prospective ClassPass member that the "Terms of Use" and "Privacy Policy" "text differs from [the] other plain text in that it provides a clickable pathway to another webpage." *Berman*, 30 F.4th at 857. However, this alone does not make the text notice of the Terms conspicuous in light of the other deficits identified herein. *See generally Oberstein*, 60 F.4th at 515-16 (remarking that hyperlinks appearing in "bright blue font" is "distinguished from the surrounding text" but conducting a fulsome, fact-intensive inquiry that also addressed "the website's general design"). Furthermore, the Court is not persuaded that internet users of average

6

text is not only larger but also far darker. (*See generally* Appendix.) Even the legal copy on the first and second pages in the sign-up webflow, which briefly describes the autorenewal terms of the membership, is larger than the text notice that mentions the Terms and Privacy Policy. (*Id.*) Additionally, the text notice containing the hyperlinks appears directly below the "Sign up with Facebook" button and further afield from the "Continue" button, which renders the visual connection between the notice and "Continue" button less clear.[4] (*Id.*)

Stepping back, the visual composition of each webpage further distracts from the faint text linking to the Terms and Privacy Policy. The text notices appear in the bottom right-hand side of the first two pages in the sign-up webflow, whereas the bulk of those pages is taken up by photos of individuals exercising and far larger text touting the benefits of ClassPass and their trial membership offering. (*See, e.g.*, *id.* (Sign-Up Webflow: Screen #2).) On the last of the three sign-up webpages, legal copy abounds, with some text appearing on the left-hand side of the page underneath high-level explanations of the trial membership. (*See, e.g., id.* (Sign-Up Webflow: Screen #3).) Whereas this final page bolds certain important information about the trial membership, for instance, that prospective members can "Cancel anytime" and that they will be provided "1 month (and 45 credits) to book any classes [they] want," no such bolding is applied to the text notice linking to the Terms and Privacy Policy. (*Id.*) The cumulative effect of these textual and organizational design choices is to *de*-emphasize references to the Terms and Privacy Policy, rendering them inconspicuous. *See also Berman*, 30 F.3d at 857 ("[T]he textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text.").

///

---

technological sophistication would automatically understand blue font to indicate the existence of a hyperlink, especially where, as here, the font is not underlined, and the text notice is not phrased to clarify to a user that they could access the Terms and Privacy Policy by clicking the blue phrases. *See id.* ("[O]ur inquiry notice standard demands conspicuousness tailored to the reasonably prudent Internet user, not to the expert user . . . .") (citing *Nguyen*, 763 F.3d at 1177, 1179).

[4] *Cf. Oberstein*, 60 F.4th at 516 ("[The] notice is conspicuously displayed directly above or below the action button . . . .").

**Unambiguously Manifested Assent**. In the online context, "[a] user's click of a button can be construed as an unambiguous manifestation of assent," so long as "the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Id.* (citing *Specht v. Netscape Communc'ns Corp.*, 306 F.3d 17, 29-30 (2d Cir. 2002)); *see id.* at 858 ("[T]he notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement."); *see also Oberstein*, 60 F.4th at 515, 517 (asking, with respect to this prong of the inquiry notice analysis, "whether the user takes some action that unambiguously manifests assent," such as clicking a designated button).

Here, the text notices and related buttons differ across the ClassPass sign-up webflow. The first page in the webflow, on which prospective members are prompted to enter their email or sign up through their Facebook account before clicking a "Continue" button, contains a notice that reads, "By clicking 'Sign up with Facebook' or 'Continue,' I agree to the Terms of Use and Privacy Policy." (Appendix (Sign-Up Webflow: Screen #1).) The second webpage prompts prospective members to enter their first and last name before clicking a "Continue" button and contains a notice that reads, "By signing up you agree to our Terms of Use and Privacy Policy." (*Id.* (Sign-Up Webflow: Screen #2).) The third and final webpage prompts prospective members to input their billing information before clicking a final "Redeem now" button. (*Id.* (Sign-Up Webflow: Screen #3).) It contains a notice that reads, in relevant part, "I agree to the Terms of Use and Privacy Policy." (*Id.*)

Sign-Up Webflow: Screens #2-3: By their plan language, the second and third webpages do not manifest unambiguous assent to the Terms. The textual notice on the second webpage refers only to "signing up." (*Id.* (Sign-Up Webflow: Screen #2).) It is unclear whether "signing up" means clicking the "Continue" button on that webpage, completing the sign-up webflow, or something else. Similarly, the third webpage simply states, "I agree to the Terms and Privacy Policy," again, without tying that assent to any unambiguous action on the part of the prospective member, such as clicking the "Redeem now" button. Plaintiff can therefore not be said to have manifested her unambiguous assent to the Terms by engaging with these two webpages. *See Berman*, 30 F.4th at 858 (holding that websites that do "not indicate to the user what action would

8

constitute assent to" their terms and conditions are not designed to collect users' unambiguous assent, even if they contain text notices referring to the existence of website terms and conditions).

Sign-Up Webflow: Screen #1: The first webpage in the ClassPass sign-up webflow, unlike the second and third webpages, contains a textual notice that ties prospective members' continuation through the webflow to their assent to the Terms. The notice specifies that "By clicking 'Sign Up with Facebook' or 'Continue,'" prospective members signify their assent. (*Id.* (Sign-Up Webflow: Screen #1).) However, the Court is not persuaded this text and the accompanying button, viewed in the context of the transaction between Ms. Chabolla and ClassPass, create circumstances in which prospective members unambiguously manifest their assent to the Terms.

As the court in *Sellers* explained, "the full context of the transaction is **critical** to determining whether a given textual notice is sufficient to put an internet consumer on inquiry notice of contractual terms . . . ." 73 Cal.App.5th at 453 (emphasis supplied). There, "[u]nlike a user who signs up for an account and clearly contemplates some sort of continuing relationship, the users . . . were merely attempting to start a free trial, making it less likely that they would scrutinize the page for small text outside the payment box or at the bottom of the screen linking them to [the website's terms of use]." *Oberstein*, 60 F.4th at 516 (citations omitted) (cleaned up). Since the transaction in *Sellers* implicated automatic, recurring payments, the court also considered disclosure requirements under California's Automatic Renewal Law as relevant to its analysis of the context of the transaction.[5] *Sellers*, 73 Cal.App.5th at 478.

---

[5] The court in *Sellers* explained that "the full context of the transaction" at issue "is critical to determining whether a given textual notice is sufficient to put an internet consumer on inquiry notice of contractual terms." 73 Cal.App.5th at 477. There, the court considered claims under California's automatic renewal legislation which are similar to those at issue here and determined the statute's notice requirements were relevant to the inquiry notice analysis. *Id.* at 477-78. The court further opined that the statute imposed a high bar for auto-renewal disclosures which need to appear "in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from the surrounding text of the same size by symbols or other marks, in a manner that clearly calls attention to the language." *Id.* at 479 (quoting the California Automatic Renewal Law ("ARL"), Cal. Bus. & Prof. Code § 17601-02). This Court need not reach whether ClassPass' disclosures comply with the ARL in order to conclude that the inquiry notice standard under *Berman* is not met.

The Ninth Circuit had occasion to consider the appropriateness of this contextual analysis in *Oberstein* and opted to apply the *Sellers* approach, rather than discredit it. 60 F.4th at 516-17 (explaining that the *Sellers* court "considered the context of the transaction" and placement of the notice" and similarly assessing "the context of" the transaction at issue) (internal quotations & citations omitted). There, the Ninth Circuit distinguished *Sellers* on the facts, noting that, "in contrast with the noncommittal free trial offered in *Sellers*, the context of this transaction, requiring a full registration process, reflected the contemplation of some sort of continuing relationship that would have put users on notice for a link to the terms of that continuing relationship." *Id.* at 517 (internal quotations & citations omitted).

This Court therefore considers, in addition to the language of the text notice on the first page in the sign-up webflow, the context within which it appears. Here, the first webpage in the sign-up webflow[6] is noticeably sparse on details and offers no indication that by completing the page a prospective member has created an account or effectuated a monetary transaction. *First,* while it refers to an "[e]xclusive deal" and refers to prospective members saving "$40 on [their] first month," the page does not specify the cost of the membership being advertised.[7] Price, arguably a material term to a contract for services, is conspicuously absent.[8] *Second*, at the point at

---

[6] As established, *supra*, the remaining pages of the sign-up webflow do not contain text notices tying prospective members' progress through the webflow to their acceptance of the Terms. Thus, prospective members cannot be said to have unambiguously manifested their assent to the Terms via those pages. The Court therefore focuses its analysis on the first page in the sign-up webflow on which the text notice refers to the Terms.

[7] ClassPass' contention that the page "informed Plaintiff that she was receiving a $40 discount on her first month for a total purchase price of $35 plus tax" is without merit. *See* Dkt. No. 28, Defendants' Motion to Compel Arbitration at 3. The page does refer, in small font in the bottom right-hand corner, that, "After [*sic*] first month, you'll auto-enroll in our $75/month plan." *See* Appendix (Sign-Up Webflow: Screen #1). This quoted language does not clearly state that the $40 discount is assessed against the "$75/month plan," and plaintiff would be excused for thinking otherwise.

The Court also acknowledges that, on the landing page preceding the sign-up webflow, it would appear prospective members may select between three membership options and that the pre-tax prices of these options are specified on that page. Bayatti Decl. at Ex. 1. If anything, the Court finds this further muddies the waters by inconsistently separating information across multiple pages. For the same reasons as described above, a counterargument on this ground would fail.

[8] Were a prospective member to click the "Terms" hyperlink, they would find no

10

which a prospective member reaches this page, they have not provided their name, billing information, billing address, or anything aside from their email address. Said differently, users have not provided and have not at this point been asked to provide any information which could enable ClassPass to bill them for ClassPass' services. *Third*, the webpage does not make any reference to the creation of an account with ClassPass. Instead, users are simply invited to "Enter [their] email to continue." (Appendix (Sign-Up Screen #1).) These characteristics reveal the page for what it is: an invitation to learn more about a special membership offer.[9]

The Court therefore agrees with plaintiff that the first page in the sign-up webflow would be more accurately characterized as "preliminary marketing material," as compared to text with a clear contractual purpose. *See Sellers*, 73 Cal.App.5th at 461 ("[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious.") (citation omitted); *see also id.* at 481 ("Because website providers have full control over the design of their websites, the onus is on them to provide adequate notice of contractual terms, particularly where, as here, the consumer is not likely expecting to be bound by such terms.")

To that end, the Court finds a reasonable internet user visiting the page would not intend, by simply entering their email and seeking to learn more about the membership offer they had been advertised, to have entered into a contractual relationship with ClassPass at that juncture.[10] *See Berman*, 30 F.4th at 855 (noting that, "the conduct of a party is not effective as a manifestation

---

assistance there, either. The Terms refer to, but do not define, membership categories or their trial period pricing. (Van Meter Decl. at Ex. 1 § 2(b).)

[9] Viewed in this light, the first page in the sign-up webflow is distinct from the sign-in/sign-up and payment pages in *Oberstein*, where a reasonably prudent internet user would understand that they were being asked to create or log into an existing account and pay for a selected purchase. *See Oberstein v. Live Nation Entertainment, Inc.*, Case No. CV 20-3888-GW-GJSx, 2021 WL 4772885 at *2 (C.D. Cal. Sept. 20, 2021), *aff'd* 60 F.4th 505 (9th Cir. 2023) (reproducing the at-issue webpages in the form of screenshots).

[10] Holding that prospective members enter into a binding agreement with ClassPass when they provide their email and having not received any consideration in exchange (*e.g.*, credits towards exercise classes) both strains basic principles of contract law and begs the question, could ClassPass therefore enforce the Terms against someone who entered their email but did not complete the rest of the sign-up webflow?

11

of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents") (citing Restatement (Second) of Contracts § 19(2) (1982)) (cleaned up). No unambiguous manifestation of assent to the Terms therefore occurs on the first page (or any subsequent page) of the sign-up webflow.

*   *   *

Finding that the Terms are not reasonably conspicuous on the webpages at issue and that prospective ClassPass members could not have unambiguously manifested their assent to the Terms through those webpages, the Court determines the *Berman* inquiry notice standard has not been met.[11] The Terms therefore do not represent an agreement between Ms. Chabolla and ClassPass.[12] The arbitration agreement contained therein is therefore invalid, and Defendants' motion to compel arbitration is consequently **DENIED**.

### IV.   CONCLUSION

For the foregoing reasons, the Court therefore **DENIES** Defendants' motion to compel arbitration.

This Order terminates Docket Number 28.

---

[11] This result is not inconsistent with *Selden v. Airbnb, Inc*. Case No. 16-cv-00933 (CRC), 2016 WL 6476934 (D.D.C. Nov. 1, 2016). There, the court expounded on the enforceability of sign-in agreements, commenting that courts tend to uphold such agreements where, among other things, "the hyperlinked terms and conditions is next to the only button that will allow the user to continue use of the website" and "notice of the hyperlinked terms and conditions is present on multiple successive webpages of the site." *Id.* at *5 (internal quotation marks & citations omitted). Yet the court in *Selden* also acknowledged that other factors relating to the "visual elements" of the webpage are also relevant, such as where they "might obscure the terms and conditions statement." *Id.* (internal quotations & citation omitted).

[12] Since challenges the actual existence of an arbitration agreement, the issue is properly directed to the court, rather than the arbitrator. *See Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979, 983 (9th Cir. 2017). Defendants' attempt to reframe these considerations in their reply fails to persuade.

IT IS SO ORDERED.

Dated: June 22, 2023

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**